## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN CHEA, Derivatively on Behalf of Nominal Defendant REPLIMUNE GROUP, INC., | ) ) ) |
| | ) Case No. 1:25-cv-12316 |
| Plaintiff, | ) |
| | ) **JURY TRIAL DEMANDED** |
| v. | ) |
| | ) |
| SUSHIL PATEL, EMILY HILL, PHILIP ASTLEY-SPARKE, MADHAVAN BALACHANDRAN, KAPIL DHINGRA, MICHAEL GOLLER, CHRISTY OLIGER, VELEKA R. PEEPLES-DYER, PAOLO PUCCI, JOSEPH SLATTERY, and DIETER WEINAND, | ) ) ) ) ) ) ) |
| | ) |
| Defendants, | ) |
| | ) |
| and | ) |
| | ) |
| REPLIMUNE GROUP, INC., | ) |
| | ) |
| Nominal Defendant. | ) |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff John Chea ("Plaintiff"), by and through his undersigned attorneys, brings this

verified stockholder derivative action on behalf of nominal defendant Replimune Group, Inc.

("Replimune" or the "Company"), against certain of the Company's executive officers and its

board of directors (the "Board") for breaches of fiduciary duties and violations of federal law

by the Individual Defendants (defined below). Plaintiff's allegations are based on personal

knowledge as to himself and his own acts, and upon information and belief as to all other

matters, based on, *inter alia*, the investigation conducted by his counsel, including review of

publicly available information regarding the Company; the allegations of a class action

complaint filed in the Securities Class Action captioned *Jboor v. Replimune Group, Inc. et al.,*

Case No. 1:25-cv-12085-JEK (D. Mass. July 24, 2025); (the "Securities Class Action"); conference call transcripts and announcements; filings with the United States Securities and Exchange Commission (the "SEC"); press releases disseminated by Replimune; legal filings; news reports; and securities analysts' reports about the Company.

## NATURE OF THE ACTION

1.    This shareholder derivative action is brought on behalf of Replimune against certain officers and members of the Company's Board for violations of the federal securities laws caused by the issuance of materially false and misleading statements issued, or caused to be issued, by the Individual Defendants in the Company's SEC filings and other public statements, as well as breach of fiduciary duty and other violations of state law between at least November 22, 2024 and July 21, 2025, inclusive (the "Relevant Period"). The Individual Defendants' wrongdoing has exposed the Company to massive potential liability to the class, as well as the significant defense costs in the Securities Class Action, as set forth below.

2.    Replimune is a clinical stage biotechnology company, primarily focused on the development of immunotherapies for the treatment of cancer. The Company's approach to cancer treatment involves designing oncolytic immunotherapies, which are genetically engineered viruses that selectively target and kill tumor cells and stimulate the immune system to attack tumors. The Company's lead oncolytic immunotherapy candidate is referred to as RP1, or vusolimogene oderparepvec.

3.    The leading clinical trial of RP1 is referred to as the IGNYTE trial. For the trial, Bristol Myers Squibb Company ("BMS") granted the Company a non-exclusive license to use its immunotherapy drug, nivolumab, in combination with RP1 for the treatment of advanced melanoma.

4.    On November 21, 2024, the Company announced the submission of a biologics license application ("BLA") to the Food and Drug Administration ("FDA") for RP1 in combination with nivolumab.

5.    Throughout the Relevant Period, the Individual Defendants caused and/or permitted the issuance of statements that were materially false and misleading, and omitted to state material adverse facts necessary to make the statements not misleading, by failing to disclose that: (i) the IGNYTE trial was not a well-controlled study and accordingly, the prospects for the success of that trial were materially overstated (ii) as result, there was a high likelihood that the Company's BLA would not secure FDA approval; and (iii) therefore, the positive statements concerning the Company's business, operations, and prospects were materially misleading and lacked a reasonable basis at all relevant times.

6.    The truth emerged on July 22, 2025, when the Company revealed that the FDA would be "unable to approve the [BLA] in its present form" due to deficiencies with the IGNYTE trial.

7.    On this news, the price of Replimune stock declined a staggering 77.24%, from a close of $12.32 per share on July 21, 2025 to a close of $2.81 per share on July 22, 2025.

8.    As a direct and proximate result of the misconduct detailed herein, the Company has incurred significant financial losses, including the cost of defending itself and, potentially, incurring class-wide damages in the Securities Class Action, as well as additional losses in market capitalization, reputational harm and the loss of goodwill.

9.    Moreover, in light of the breaches of fiduciary duty by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the Securities Class

Action, and that the Individual Defendants are beholden to each other based on their longstanding business and personal relationships, the Individual Defendants do not possess the requisite level of disinterestedness and independence to consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") because Plaintiff's claims raise a federal question under Sections 10(b) and 21D of the Exchange Act.

11.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

12.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

13.     In connection with the acts, conduct and other wrongs complained of herein, the Individual Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

14.     Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. §1391(b)(1), as Replimune maintains its principal executive offices in this District and a substantial portion of the acts and omissions alleged herein, including the issuance and dissemination of materially false and misleading information, occurred in this District.

## PARTIES

*Plaintiff*

15.     Plaintiff is, and has been at all relevant times, a shareholder of Replimune.

*Nominal Defendant*

16.     Nominal Defendant Replimune is incorporated under the laws of the State of Delaware.

17.     The Company's principal executive offices are located at 500 Unicorn Park Drive, Suite 303, Woburn, Massachusetts, 01801. Replimune's common stock trades on the Nasdaq Stock Market ("NASDAQ") under the ticker symbol "REPL."

*Individual Defendants*

18.     Defendant Sushil Patel ("Patel") has served as the Company's Chief Executive Officer ("CEO") and as a member of the Board since April 2024. Defendant Patel previously served as the Company's Chief Strategy Officer from January 2023 until April 2024, and as its Chief Commercial Officer from May 2021 until January 2023. Defendant Patel is named as a defendant in the Securities Class Action. According to the Company's public filings, Defendant Patel received $3,697,661 during the fiscal year ended March 31, 2025 in compensation from the Company. As of June 30, 2025, Defendant Patel beneficially owned 390,239 shares of Replimune common stock, worth roughly $3.6 million.[1]

19.     Defendant Philip Astley-Sparke ("Astley-Sparke") co-founded the Company and has served as a member of the Board since its inception in 2015 and as the Board's Executive Chairman since April 2024. Defendant Astley-Spark previously served as the Company's CEO

---

[1] Valuations of the Individual Defendants' personal holdings of Company stock are calculated based on the $9.29 per share closing price of Replimune common stock on June 30, 2025.

from January 2020 until April 2024 and as Executive Chairman of the Board from 2015 until January 2020. As of June 30, 2025, Defendant Astley-Sparke beneficially owned 2,304,054 shares of Replimune common stock, worth roughly $21.4 million.

20.     Defendant Madhavan Balachandran ("Balachandran") has served as a member of the Board since September 2024. According to the Company's public filings, Defendant Balachandran received $486,706 during the fiscal year ended March 31, 2025 in compensation from the Company.

21.     Defendant Kapil Dhingra ("Dhingra") has served as a member of the Board since 2017. According to the Company's public filings, Defendant Dhingra received $235,161 during the fiscal year ended March 31, 2025 in compensation from the Company. As of June 30, 2025, Defendant Dhingra beneficially owned 248,910 shares of Replimune common stock, worth roughly $2.3 million.

22.     Defendant Michael Goller ("Goller") has served as a member of the Board since March 2025. According to the Company's public filings, Defendant Goller received $543,132 during the fiscal year ended March 31, 2025 in compensation from the Company.

23.     Defendant Christy Oliger ("Oliger") has served as a member of the Board since 2021. According to the Company's public filings, Defendant Oliger received $234,257 during the fiscal year ended March 31, 2025 in compensation from the Company. As of June 30, 2025, Defendant Oliger beneficially owned 106,700 shares of Replimune common stock, worth $991,243.

24.     Defendant Veleka R. Peeples-Dyer ("Peeples-Dyer") has served as a member of the Board since June 2023 and served as a member of the Audit Committee during the Relevant Period. According to the Company's public filings, Defendant Peeples-Dyer received $227,661

during the fiscal year ended March 31, 2025 in compensation from the Company. As of June 30, 2025, Defendant Peeples-Dyer beneficially owned 66,650 shares of Replimune common stock, worth $619,179.

25.     Defendant Paolo Pucci ("Pucci") has served as a member of the Board since April 2020. According to the Company's public filings, Defendant Pucci received $227,418 during the fiscal year ended March 31, 2025 in compensation from the Company. As of June 30, 2025, Defendant Pucci beneficially owned 123,200 shares of Replimune common stock, worth roughly $1.1 million.

26.     Defendant Joseph Slattery ("Slattery") has served as a member of the Board since 2017 and served as Chairperson of the Audit Committee during the Relevant Period. According to the Company's public filings, Defendant Slattery received $240,161 during the fiscal year ended March 31, 2025 in compensation from the Company. As of June 30, 2025, Defendant Slattery beneficially owned 172,756 shares of Replimune common stock, worth roughly $1.6 million.

27.     Defendant Dieter Weinand ("Weinand") has served as a member of the Board since June 2018 and served as a member of the Audit Committee during the Relevant Period. According to the Company's public filings, Defendant Weinand received $264,049 during the fiscal year ended March 31, 2025 in compensation from the Company. As of June 30, 2025, Defendant Weinand beneficially owned 184,550 shares of Replimune common stock, worth roughly $1.7 million.

***Officer Defendant***

28.     Defendant Emily Hill ("Hill") has served as the Company's Chief Financial Officer ("CFO") since September 19, 2023. Defendant Hill is named as a defendant in the Securities Class Action. According to the Company's public filings, Defendant Hill received $1,594,953 during

the fiscal year ended March 31, 2025 in compensation from the Company. As of June 30, 2025, Defendant Hill beneficially owned 123,418 shares of Replimune common stock, worth roughly $1.1 million.

### FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

29.     Because of their positions as officers and/or directors of Replimune, and their ability to control the business and corporate affairs of the Company, the Individual Defendants owed Replimune and its shareholders fiduciary obligations of good faith, loyalty, trust, and candor and were required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner at all relevant times.

30.     Therefore, the Individual Defendants were required to act in furtherance of the best interests of Replimune and its shareholders.

31.     Each director and officer of the Company owes to Replimune and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

32.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Replimune, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

33.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of trust, loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Replimune, the absence of good faith

on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

34.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, earnings, internal controls, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the IGNYTE clinical trial and RP1's clinical prospects, and the Individual Defendants had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

35.     To discharge their duties, the officers and directors of Replimune were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Replimune were required to, among other things:

(a)     Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Replimune's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b)     Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(c)    Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion;

(d)    Remain informed as to how Replimune conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(e)    Establish and maintain systematic and accurate records and reports of the business and internal affairs of Replimune and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(f)    Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Replimune's operations would comply with all applicable laws and Replimune's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(g)    Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(h)    Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above;

(i)    Oversee and manage the primary risks associated with the Company's operations, including clinical trials and clinical development risks; and

(j)     When put on notice of problems with the Company's business practices, operations, or internal controls, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence; and

36.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Replimune.

37.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Replimune and were at all times acting within the course and scope of such agency.

38.     Each of the Individual Defendants breached his or her fiduciary duties as alleged herein, both individually and in concert with the other Defendants.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

39.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

40.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

41.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company, purposefully, recklessly, or negligently, to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

42.    In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of Replimune, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

43.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

44.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Replimune and at all times acted within the course and scope of such agency.

### REPLIMUNE'S CODE OF CONDUCT

45.    Replimune's Code of Conduct begins with a commitment to "apply high ethical, moral and legal principles in every aspect of [the Company's] business conduct."

46.    The Code of Conduct states that its purpose is to:

[D]eter wrongdoing and promote the following:

- honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

- full, fair, accurate, timely, objective, complete, relevant and understandable disclosure in reports and documents that the Company files with, or submits to, the Securities and Exchange Commission (the "SEC"), the Food and Drug Administration or other regulatory and

governmental agencies, and its stockholders, as well as in other public communications made by the Company;

- compliance with applicable governmental laws, rules and regulations;

- prompt internal reporting to an appropriate person or persons identified herein of violations of this Code; and

- strict accountability for adherence to this Code.

47.     The Code of Conduct applies to "each of the Company's employees, executive officers, directors and others acting on behalf of the Company," and violations of the Code of Conduct will lead to "discipline, up to and including termination of employment or other relationship."

48.     The Code of Conduct states that the Company "at all times emphasizes a culture that includes . . . a commitment to performing outstanding scientific and clinical development" and "appropriate transparency in our work and business."

49.     With respect to conflicts of interest, the Code of Conduct states, in pertinent part:

A "conflict of interest" exists when a Company Party's private interest interferes in any way or appears to interfere in any way with the interests of the Company. A conflict of interest can arise when a Company Party acts or has interests that may make it difficult for him or her to objectively and effectively perform his or her work for the Company. Conflicts of interest also can arise when a Company Party, or members of his or her family, receives improper personal benefits because of his or her position in the Company, including without limitation loans or guarantees of obligations.

Transactions or relationships that constitute conflicts of interest are prohibited unless specifically approved by the Board or an appropriate committee of the Board.

50.     In a section titled "Responsibility with Respect to Public Disclosures," the Code of Conduct states, in pertinent part:

The Company is committed to providing full, fair, accurate, timely and understandable disclosure in its public communications and in the reports and documents that the Company files with regulatory authorities, including the SEC.

13

Strict laws apply to how the Company discloses information to its investors. These laws require the Company to make certain that any information it releases to the public about its business, preclinical and clinical results, financial condition or operating results is accurate and consistent. Strict compliance with both the spirit and the letter of the law governing public disclosures and reporting to the SEC is required. The Company's disclosures will enable its stockholders to understand (i) the key business opportunities we see, (ii) the issues and risks we manage, (iii) the critical accounting policies we employ and (iv) the important judgments we make in preparing our financial statements.

51.    In a section titled "Fair Dealing," the Code of Conduct states, in pertinent part, that "[t]he Company seeks to outperform its competition fairly and honestly through superior performance and not through unethical or illegal business practices."

52.    With respect to the Company's corporate assets, the Code of Conduct states, in pertinent part, that "Company Parties must endeavor to protect the Company's assets and property and ensure their efficient and proper use. Theft, carelessness and waste have a direct impact on the Company's profitability."

53.    With respect to legal compliance, the Code of Conduct states, in pertinent part, that "[a]ll Company Parties must respect and obey the laws, rules and regulations of the cities, states and countries in which the Company operates."

## REPLIMUNE'S  RESEARCH & DEVELOPMENT COMMITTEE CHARTER

54.    Replimune's Research & Development Committee Charter states that "[t]he Committee shall provide guidance to management and the Board with respect to the Company's research and development efforts and product pipeline, including providing input on the Company's preclinical studies, clinical trials and clinical development risk."

55.    The Charter provides that the Committee must:

- Meet with the Company's Chief Research & Development Officer and Chief Medical Officer at least three times per year to review the progress of the Company's research and development program and product pipeline.

- Assess each program's and product candidate's progress against its targets.

- Present to the Board a summary of all significant findings concerning the progress of the Company's research and development program and product pipeline as discussed at Research & Development Committee meetings.

- Request ad hoc meetings of the Research & Development Committee as necessary to discuss topics pertinent to the particular material research and development activities of the company as may be needed from time to time, or at the request of the Board.

- Engage, as the Committee may determine, in an annual self-assessment with the goal of continuing improvement, and annually review and reassess the adequacy of this charter and recommend any changes to the full Board.

- Perform any other activities consistent with this charter, the Company's certificate of incorporation and by-laws, each as may be amended from time to time and in effect, and applicable law, as the Committee or the Board deems appropriate.

## REPLIMUNE'S AUDIT COMMITTEE CHARTER

56.     Replimune's Audit Committee Charter states that the purpose of the Audit Committee is to "assist the Board in overseeing the quality and integrity of the Company's financial statements, its compliance with legal and regulatory requirements, the performance of its internal audit function, if any, and the selection, appointment, qualifications, performance and independence of the registered public accounting firm."

57.     With respect to "Audits, Financial Statements and Earnings Releases," the Audit Committee Charter tasks the Audit Committee with the following responsibilities:

- The Committee will discuss with the Company's registered public accounting firm the overall scope and plans for the annual audit.

- The Committee will review and discuss with management and the Company's registered public accounting firm the audited financial statements (including Management's Discussion and Analysis contained therein) to be included in the Company's Annual Report on Form 10-K. The Committee also will discuss the results of the annual audit and any other matters required to be communicated to the Committee by the Company's registered public accounting firm. Based

on the foregoing and on review of other information made available to the Committee, the Committee will recommend to the Board whether the audited financial statements should be included in the Company's Form 10-K.

- The Committee will review the interim financial statements with management and the Company's registered public accounting firm prior to the filing of each of the Company's Quarterly Reports on Form 10-Q. The Committee also will discuss the results of the quarterly review and any other matters required to be communicated to the Committee by the Company's registered public accounting firm.

- The Committee will discuss with the registered public accounting firm any noted or proposed accounting adjustments, communications between the auditors and the audit firm's national office regarding auditing or accounting issues presented by the engagement and any proposed "management" or "internal control" letters.

- The Committee will discuss with the registered public accounting firm the matters required to be discussed under the standards of the PCAOB relating to the conduct of the audit including any difficulties encountered in the course of the audit work, including management's response to these difficulties, any restrictions on the scope of activities or access to requested information and any significant disagreements with management.

- The Committee will obtain from the registered public accounting firm assurance that Section 10A(b) of the Exchange Act (including auditor discovery that illegal acts may have occurred) has not been implicated.

- The Committee will review and discuss with the independent public accountants the matters required to be discussed by Auditing Standard No. 16, as adopted by the PCAOB and as amended from time to time.

- The Committee will review each other report of the Company's registered public accounting firm delivered to the Committee concerning: (i) all critical accounting policies and practices to be used; (ii) all alternative treatments of financial information within generally accepted accounting principles that have been discussed with management, ramifications of the use of such alternative disclosures and treatments and the treatment preferred by the Company's registered public accounting firm; and (iii) other material written communications between the Company's registered public accounting firm and management, such as any management letter or schedule of unadjusted differences.

- The Committee will review and discuss earnings press releases, and corporate practices with respect to earnings press releases and financial information and earnings guidance provided to analysts and ratings agencies.

58. With respect to "Controls Over Financial Reporting," the Audit Committee Charter

tasks the Audit Committee with the following responsibilities:

- The Committee will discuss with management, internal audit personnel, if any, and the Company's registered public accounting firm management's process for assessing the effectiveness of internal controls over financial reporting under Section 404 of the Sarbanes-Oxley Act, if applicable, including any significant deficiencies or material weaknesses identified.

- The Committee will discuss with management its process for performing its required quarterly and annual certifications under Section 302 of the Sarbanes-Oxley Act.

- The Committee will discuss with management, internal audit personnel, if any, and the Company's registered public accounting firm any (i) changes in internal controls over financial reporting that have materially affected or are reasonably likely to materially affect the Company's internal controls over financial reporting that are required to be disclosed and (ii) other changes in internal controls over financial reporting that were considered for disclosure in the Company's periodic filings with the SEC.

- The Committee will discuss with the Company's registered public accounting firm the characterization of deficiencies in internal controls over financial reporting and any differences between management's assessment of the deficiencies and that of the Company's registered public accounting firm. The Committee will review the disclosures describing any identified material weaknesses and management's remediation plans.

59. With respect to "Compliance Matters," the Audit Committee Charter states:

- The Committee will provide the Audit Committee report that the proxy rules of the SEC require be included in the Company's annual proxy statement.

- The Committee will report regularly to the Board to review any issues which arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal and

regulatory requirements, the performance and independence of the Company's independent auditors, and the performance of the Company's internal audit function, if any.

- The Committee will review with senior management the Company's overall anti-fraud programs and controls.

- The Committee will establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and the confidential, anonymous submission by Company employees of concerns regarding questionable accounting or auditing matters, and will monitor ongoing compliance with those procedures

- In the event the Committee is made aware of any allegation of fraud relating to the Company or any of its officers, directors or employees that the Committee deems could be material to the Company's business or operations, the Committee will (i) review such allegation and (ii) if the Committee deems it necessary or advisable, engage independent counsel to assist in an investigation.

*      *      *

- The Committee will at least annually review and discuss the Company's policies with respect to risk assessment and risk management. The Committee will meet regularly with officer(s) responsible for risk management with respect to operational, financial, strategic, compliance and reputational risks and report its findings to the Board.

## **SUBSTANTIVE ALLEGATIONS**

### *Background*

60.     Replimune is a clinical stage biotechnology company, primarily focused on the development of immunotherapies for the treatment of cancer. The Company's approach to cancer treatment involves designing oncolytic immunotherapies, which are genetically engineered viruses that selectively target and kill tumor cells and stimulate the immune system to attack tumors. The Company's lead oncolytic immunotherapy candidate is referred to as RP1, or vusolimogene oderparepvec.

61.     The leading clinical trial of RP1 is referred to as the IGNYTE trial. For the trial,

BMS granted the Company a non-exclusive license to use its immunotherapy drug, nivolumab, in combination with RP1 for the treatment of advanced melanoma.

62.     On November 21, 2024, the Company announced the submission of a BLA to the FDA for RP1 in combination with nivolumab.

63.     On July 22, 2025, the Company announced that the FDA would be "unable to approve the [BLA] in its present form" due to deficiencies with the IGNYTE trial.

***False and Misleading Statements***

64.     On November 21, 2024, Replimune issued a press release, titled "Replimune Receives Breakthrough Therapy Designation for RP1 and Submits Biologics License Application to the FDA under the Accelerated Approval Pathway." The press release stated, in relevant part:

> [Replimune] today announced that it has submitted a biologics license application (BLA) to the FDA for RP1 (vusolimogene oderparepvec) in combination with nivolumab for the treatment of adult patients with advanced melanoma who have previously received an anti-PD1 containing regimen. The submission was made under the Accelerated Approval pathway. The Company also announced that the FDA has granted Breakthrough Therapy designation to RP1 in combination with nivolumab in the same setting.

> Breakthrough Therapy designation is intended to expedite the development and review of therapies for serious diseases ***when preliminary clinical evidence indicates that the therapy may provide substantial improvement over existing available therapies*** on one or more clinically significant endpoints. ***This Breakthrough Therapy designation is based on the safety and clinical activity observed in the anti-PD1 failed melanoma cohort of the IGNYTE clinical trial.***[2]

65.     The press release quoted Defendant Patel, touting RP1's clinical prospects and stating that "[t]oday is an important milestone for Replimune and for the melanoma community as we are one step closer to having another potential treatment available for patients who have limited options after progressing on anti-PD1 containing regimens."

---

[2] Unless indicated otherwise, all emphasis is added.

66.    On February 12, 2021, the Company filed a quarterly report on Form 10-Q with the

SEC for the fiscal period ended December 31, 2024 (the "3Q25 10-Q"). With respect to the

IGNYTE trial, the 3Q25 10-Q stated:

> ***Our leading clinical trial of RP1 is our IGNYTE trial***, a multi-cohort clinical trial
> being conducted in collaboration with Bristol Myers Squibb Company, or BMS,
> under which BMS has granted us a non-exclusive, royalty-free license to, and is
> supplying at no cost, its anti-PD-1 therapy, nivolumab, for use in combination with
> RP1. ***The leading tumor specific cohort in the IGNYTE trial is our registration
> directed Phase 2 expansion cohort in anti-PD-1 failed cutaneous melanoma***. The
> anti-PD1 failed melanoma cohort from the IGNYTE clinical trial includes 140
> patients who received RP1 plus nivolumab. The primary analysis by independent
> central review was triggered once all patients had been followed for at least 12
> months. The topline results showed the overall response rate, or ORR, was 33.6%
> by modified RECIST 1.1 criteria, the primary endpoint as defined in the protocol,
> and 32.9% by RECIST 1.1 criteria, an additional analysis requested by the U.S.
> Food and Drug Administration, or FDA. ***Responses from baseline were highly
> durable with 85% of responses lasting more than 12 months***. The median duration
> of response from baseline was 27.6 months and the median duration of response
> from treatment initiation was 21.6 months. RP1 combined with nivolumab
> continues to be well-tolerated, with mainly Grade 1-2 "on target" side effects,
> observed. In September 2024, we presented the independently reviewed data from
> the IGNYTE clinical trial, including key secondary endpoints and subgroup
> analyses as a late-breaking abstract during an oral session at the European Society
> for Medical Oncology, or ESMO. Data presented at ESMO showed activity across
> all subgroups, including patients who had prior anti-PD1 and anti-CTLA-4
> treatment had an ORR of 27.7% and patients who had primary resistance to anti-
> PD1 had an ORR of 35.9% by modified RECIST v1.1. In November 2024, we
> announced submission of a biologics license application (BLA) to the FDA for RP1
> (vusolimogene oderparepvec) in combination with nivolumab for the treatment of
> adult patients with advanced melanoma who have previously received an anti-PD1
> containing regimen and that the FDA has granted Breakthrough Therapy
> designation to RP1 in combination with nivolumab in the same setting. The
> submission was made under the Accelerated Approval pathway. We recently
> announced the FDA accepted our BLA and granted priority review with a
> Prescription Drug User Fee Act goal date of July 22, 2025.

67.    On May 22, 2025, Replimune filed an annual report on Form 10-K with the SEC,

for the fiscal year ended March 31, 2025 (the "2025 10-K"), which was signed by Defendants

Patel, Hill, Astley-Sparke, Dhingra, Balachandran, Oliger, Pucci, Slattery, Peeples-Dyer,

Weinand, and Goller. With respect to RP1 and the IGNYTE trial, the 2025 10-K stated:

*Our leading clinical trial of RP1 [or vusolimogene oderparapvec] is referred to as the IGNYTE trial*, which is a multi-cohort clinical trial being conducted in collaboration with Bristol Myers Squibb Company, or BMS, under which BMS has granted us a nonexclusive, royalty-free license to, *and is supplying at no cost, its anti-PD-1 therapy, nivolumab, for use in combination with RP1.*

The leading tumor specific cohort in the IGNYTE trial is our registration directed Phase 2 expansion cohort in anti-PD-1 failed cutaneous melanoma. The anti-PD-1 failed melanoma cohort from the IGNYTE trial includes 140 patients who received RP1 in combination with nivolumab. The primary analysis by independent central review was triggered once all patients had been followed for at least 12 months. The topline results showed the overall response rate, or ORR, was 33.6% by modified RECIST 1.1 criteria, the primary endpoint as defined in the protocol, and 32.9% by RECIST 1.1 criteria, an additional analysis requested by the FDA. *Responses from baseline were highly durable with 85% of responses lasting more than 12 months*. The median duration of response from baseline was 27.6 months and the median duration of response from treatment initiation was 21.6 months. RP1 combined with nivolumab continues to be well-tolerated, with mainly Grade 1-2 "on target" side effects, observed. In September 2024, we presented the independently reviewed data from the IGNYTE trial, including key secondary endpoints and subgroup analysis as a late-breaking abstract during an oral session at the European Society for Medical Oncology, or ESMO. Data presented at ESMO showed activity across all subgroups, including patients who had prior anti-PD-1 and anti-CTLA-4 treatment had an ORR of 27.7% and patients who had primary resistance to anti-PD-1 had an ORR of 35.9% by modified RECIST v1.1. In November 2024, we presented a late-breaking abstract featuring the IGNYTE trial primary analysis that had been selected for oral presentation at the 39th Annual Meeting of the Society for Immunotherapy of Cancer (SITC 2024). The data presented at SITC 2024 included further clinical subgroup and initial biomarker data from the IGNYTE trial.

*In November 2024, we announced submission of a biologics license application, or BLA, to the FDA for RP1 (vusolimogene oderparepvec) in combination with nivolumab for the treatment of adult patients with advanced melanoma* who have previously received an anti-PD-1 containing regimen and that the FDA has granted Breakthrough Therapy designation to RP1 in combination with nivolumab in the same setting. The submission was made under the accelerated approval pathway. *The FDA accepted our BLA and granted priority review with a Prescription Drug User Fee Act, or PDUFA, goal date of July 22, 2025. The FDA recently completed their late-cycle review meeting and all manufacturing inspections for the BLA and we believe we remain on track for the July 22, 2025 PDUFA date.*

68.    During a related earnings call to discuss the Company's quarterly financial results, hosted by the Company on the same day (the "4Q25 Earnings Call"), the following exchange

occurred between an analyst and Defendants Hill and Patel:

**Jonathan Chang – Leerink Partners – Analyst**
Hi, guys. Good morning. Thanks for taking the questions. Congrats on the progress and for hosting what I believe is your first earnings call. First question, can you discuss the impact you're seeing from the recent regulatory changes and provide any color on recent FDA interactions?

And then on second question on [IGNYTE], can you discuss the translation of response rate into metrics like PFS and OS? And what benchmarks are you pointing to for PFS and OS in the anti-PD1 field melanoma setting? Thank you.

**Defendant Hill**
Thanks, Jonathan. This is Emily. I'll take the first segment of your question. So just as a reminder for those on the call, we received breakthrough through designation late last year and then submitted our BLA for RP1 and PD1 failed melanoma. Our BLA was accepted in January with a priority review. ***And since that 6 January, we've been responding to information requests from the FDA in a timely and thorough manner.***

We're very grateful to have seen committed and consistent engagement from our review team, and we haven't seen any changes to the cadence of that commitment. Having recently completed both our late-cycle meeting with the FDA and our manufacturing inspections. ***We're very pleased with the outcome of those interactions, and we believe there are no impediments. We're on track for our July 22 PDIFA.***

**Defendant Patel**
And Jonathan, just to address your second question. And yes, you're right, it's the first call, which we're very excited about. So, in terms of the data that we've seen for IGNYTE, just as a reminder, we've seen around patient 1/3 of patients achieved durable responses, which you look at median duration response of more than 20 months. This is a single-arm study, as you're aware. And so obviously, there are some limitations of PFS and OS in this study. ***However, we've seen a PFS of around 4 months and the overall survival, which I think is actually very impressive***, where we've seen more than about 55% of patients still alive at 3 years. And so, we think that's going to be very meaningful relative to other options in this space.

You asked about the benchmarks we should be using. ***And I think it is important to remember that the IGNYTE did use a very strict criteria for anti-PD1 failure***, and there is an exact apples-to-apples comparisons. But if you think about some of the other studies and assets or molecules used in this space, such as ipi/nivo or Opteolag having failed either ipi/nivo or Opteolag in the frontline setting, you see about a 12% response rate. And typically, physicians and KOLs will tell you would not expect to see median overall survival of more than 12 months.

So, I think that's a reasonable benchmark that most people use. Further checkpoint inhibition after failure of prior checkpoint inhibition really only results in a response rate of 6% or 7% with very modest overall survival benefits.

69.     Later during the 4Q25 Earnings Call, the following exchange occurred between an

analyst and Defendant Patel:

**Allison Bratzel – Piper Sandler – Analyst**
Good morning. Thanks, guys, for taking my question. Just on the confirmatory IGNITE3 trial, I think you initiated dosing of patients last summer. So, could you just talk to your experience to date with that trial and what you're seeing in terms of enrollment, opening of trial sites and things like that. And just expectations on a time line for completing enrollment. Any color there would be helpful.

And second, could you talk to your expectations on the potential label or label discussions for RP1? And just what gives you confidence in a broad label and achieving broad access? Thank you.

**Defendant Patel**
***So, just in terms of IGNYTE*** or IGNYTE3, just as a reminder for people, ***this is a large randomized study,*** a confirmatory Phase III trial with 400 patients where we're combining RP1 with nivolumab versus limited dealers' choice, which includes [indiscernible], chemotherapy or single-agent checkpoint inhibition. ***This is a trial that's going to have more than 100 sites globally. And as you can imagine, we've been providing the agency the updates on the timelines for the overall study and enrollment updates on a regular basis.***

***We expect the trial to take a couple of years to complete enrollment given the study population and size of the study. But -- and as you can imagine, right now, we're intentionally focusing on enrolling in U.S. sites given the upcoming PDUFA, and when we realize that at approval patients will not want to be randomized into the control arm.*** So, given that we're really focusing our efforts and driving enrollment in the U.S., it's going very well. There's a lot of excitement around the trial. And what we're actually now doing is spending a lot of time on the rest of world expansion.

So, at PDUFA, we would continue to see enrollment in that study in countries such as The U.K, Australia and Europe. And again, there's equally high-level excitement from ex U.S. Investigators around the trial. We look forward to speaking to many of them at the upcoming ASCO meeting. And then you asked the second question, I believe, on the broad label. Is that correct?

**Allison Bratzel – Piper Sandler – Analyst**
Yes.

**Defendant Patel**

I'm not all likely. Yes. Just as a reminder, ***IGNYTE, we enrolled a real-world population, which included really pretty much every type of anti PD1 felt presentation. We saw consistent benefit across all the subgroups.***

So, we would expect the label and as you know, now that we finished the late cycle meeting, we'll be going into labeling discussions to very much reflect the study population that we investigated in the INITRAL and would expect a label to reflect that broad population.

70.     The statements identified above were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) the IGNYTE trial was not a well-controlled study and accordingly, its trial prospects were widely overstated (ii) as result, RP1's clinical prospects were overstated and there was a high likelihood that the Company's BLA would not secure FDA approval; and (iii) as a result, positive statements concerning the Company's business, operations, and prospects were materially misleading and lacked a reasonable basis at all relevant times.

***The Truth Emerges***

71.     On July 22, 2025, the Company issued a press release titled "Replimune Receives Complete Response Letter from FDA for RP1 Biologics License Application for the Treatment of Advanced Melanoma." The press release revealed that the FDA would not be able to approve the BLA due to deficiencies with the IGNYTE trial:

> [Replimune], a clinical stage biotechnology company pioneering the development of novel oncolytic immunotherapies, today announced that the U.S. Food and Drug Administration (FDA) has issued a Complete Response Letter (CRL) regarding the Biologics License Application (BLA) for RP1 (vusolimogene oderparepvec) in combination with nivolumab for the treatment of advanced melanoma.
>
> ***The CRL indicates that the FDA is unable to approve the application in its present form. The FDA has indicated that the IGNYTE trial is not considered to be an adequate and well-controlled clinical investigation that provides substantial evidence of effectiveness.*** Furthermore, the FDA said the trial cannot be adequately interpreted due to the heterogeneity of the patient population. ***The CRL also states that there are items related to the confirmatory trial study design***

*which need to be addressed, including contribution of components. Importantly, no safety issues were raised.*

The Company will request a Type A meeting *and expects it will be granted within 30 days.* Replimune plans to urgently interact with the FDA to find a path forward for the timely accelerated approval of RP1 without which the development of RP1 for advanced cancer patients with limited options will not be viable.

72.     On this news, the price of Replimune stock declined a staggering 77.24%, from a close of $12.32 per share on July 21, 2025 to a close of $2.81 per share on July 22, 2025.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

73.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties and other violations of law.

74.     Replimune is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

75.     Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

76.     Plaintiff is an owner of Replimune stock and has been a continuous holder of the Company's common shares at all relevant times.

77.     At the time this action was commenced, the ten-member Board was comprised of Defendants Patel, Astley-Sparke, Weinand, Balachandran, Dhingra, Goller, Oliger, Peeples-Dyer, Pucci, and Slattery. Accordingly, Plaintiff is only required to show that five directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, all of the Board's current directors are incapable of making an independent and disinterested decision to institute and vigorously

prosecute this action, including because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

78.    The Individual Defendants, together and individually, violated and breached their fiduciary duties of candor, good faith, and loyalty. Specifically, the Individual Defendants knowingly approved and/or permitted the wrongs alleged herein and participated in efforts to conceal those wrongs. The Individual Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized, and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein. Accordingly, the Individual Defendants could not fairly and fully prosecute such a suit even if they instituted it.

79.    The Individual Defendants either knowingly or recklessly issued or caused the Company to issue the materially false and misleading statements alleged herein. The Individual Defendants knew of the falsity of the misleading statements at the time they were made. As a result of the foregoing, the Individual Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

80.    As members of the Board charged with overseeing the Company's affairs, each of the Individual Defendants had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of Replimune, the Individual Defendants knew, or should have known, the material facts surrounding the IGNYTE trial and RP1's clinical prospects.

81.    Defendants Patel and Astley-Sparke are not disinterested or independent and are therefore incapable of considering a demand. Defendant Patel has served as the Company's CEO

since April 2024 and Defendant Astley-Sparke co-founded the Company and has served as Board's Executive Chairman since April 2024. Accordingly, in the Company's public filings, it admits that each of its directors "other than Sushil Patel, our Chief Executive Officer, and Philip Astley-Spark, our Executive Chairman, has no relationship that would interfere with the exercise of independent judgment in carrying out the responsibilities of a director." Further, Defendant Astley-Sparke, as one of the Company's co-founders, cannot reasonably be expected to consider with disinterestedness whether to sue fellow directors of a company that he founded and helped to build from inception. Additionally, Defendant Patel is not disinterested or independent because he is named as a defendant, and faces significant personal liability, in the Securities Class Actions based on substantially the same wrongdoing as alleged herein, specifically issuing materially false and misleading statements during the Relevant Period.

82.    Defendants Balachandran, Dhingra, Oliger, and Pucci serve as members of the Research & Development Committee and, pursuant to the Committee's Charter, were responsible for, *inter alia*, providing guidance and input to the Board and management "on the Company's . . . clinical trials and clinical development risk"; "[a]ssess[ing] each program's and product candidate's progress against its targets"; and "[p]resent[ing] to the Board a summary of all significant findings concerning the progress of the Company's research and development program and product pipeline as discussed at Research & Development Committee meetings." Throughout the Relevant Period, however, these Defendants breached the duties specifically imposed by the Committee's Charter, as well as their fiduciary duties, by failing to detect, prevent, or correct the deficiencies in the IGNYTE trial cited by the FDA in the CRL for the denial of the BLA for RP1. Specifically, these Defendants failed to detect, prevent, or correct that the IGNYTE trial was not an adequate and well-controlled clinical investigation that provided substantial evidence of the

effectiveness of RP1, that the heterogeneity of the patient population prevented the FDA from adequately interpreting the trial, and there were "items related to the confirmatory trial study design which need[ed] to be addressed, including contribution of components."

83.     Defendants Slattery, Peeples-Dyer, and Weinand serve as members of the Audit Committee and, pursuant to the Charter, were specifically charged with the responsibility of assisting the Board in fulfilling its oversight responsibilities related to internal controls over financial reporting and public disclosure requirements. Throughout the Relevant Period, however, these Defendants breached their fiduciary duties to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the IGNYTE trial and the adequacy of the Company's internal controls as alleged above. Therefore, Defendants Slattery, Peeples-Dyer, and Weinand cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihood.

84.     Additionally, each of the directors received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company. Indeed, all of the Individual Defendants benefitted directly from the wrongdoing alleged herein. Specifically, the Individual Defendants benefitted from the artificial inflation of the price of the Company's stock and the resulting increase in the value of Replimune stock and stock options they held.

85.     The Individual Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Individual Defendants to also adhere to Replimune's standards of business conduct. The Individual Defendants violated the Code

of Conduct because they knowingly or recklessly engaged in and participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Individual Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

86.     Furthermore, demand in this case is excused because each of the directors derive substantial revenue from the Company, control the company, and are indebted to each other. These conflicts of interest have precluded the current directors from adequately monitoring the Company's operations and internal controls and calling into question the other Individual Defendants' conduct. Significantly, none of the Board's current members have taken remedial action to redress the conduct alleged herein.

87.     The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

88.     The acts complained of herein constitute violations of fiduciary duties owed by Replimune's officers and directors, and these acts are incapable of ratification.

89.     The Individual Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate

funds, i.e., monies belonging to the stockholders of Replimune. If there is a directors' and officers' liability insurance policy covering the Individual Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Individual Defendants, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Individual Defendants were to sue themselves or certain officers of Replimune, there would be no directors' and officers' insurance protection. Accordingly, the Individual Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Individual Defendants is futile and, therefore, excused.

90.    If there is no directors' and officers' liability insurance, then the Individual Defendants will not cause Replimune to sue the Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

91.    Accordingly, for all of the reasons set forth above, all of the current directors cannot consider a demand with disinterestedness and independence. Consequently, a pre-suit demand on the Board is futile and excused.

## COUNT I

### Against Defendants Patel and Hill for
### Contribution Under Section 10(b) and 21D of the Securities Exchange Act of 1934

93.    Plaintiff incorporates by reference and realleges each and every allegation above, as though fully set forth herein. Replimune, along with Defendants Patel and Hill (the "Officer Defendants"), are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC

Rule 10b-5 promulgated thereunder. The Securities Class Action alleges that the class members relied, directly or indirectly, upon the false and misleading statements and omissions, as alleged herein, in purchasing Replimune securities. The Securities Class Action further alleges that, as a direct and proximate result, the class members suffered damages because the value of their investments were artificially inflated by the false and misleading statements and omissions, they purchased such securities at the artificially inflated prices, and the value of their investments fell when the truth was eventually revealed, causing economic losses to the class members. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to the Officer Defendants' willful and/or reckless violations of their obligations as officers and/or directors of the Company. The Officer Defendants, because of their positions of control and authority as senior executive officers of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action. Accordingly, the Officer Defendants are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act. As such, the Company is entitled to receive all appropriate contribution or indemnification from the Officer Defendants.

## COUNT II

### Against the Individual Defendants for
### Breach of Fiduciary Duties

94.    Plaintiff incorporates by reference and realleges each and every allegation above, as though fully set forth herein.

95.     The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

96.     The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

97.     The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

98.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

99.     Plaintiff, on behalf of Replimune, has no adequate remedy at law.

## COUNT III

**Against the Individual Defendants for Aiding and
Abetting Breach of Fiduciary Duty**

100.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein. By encouraging and accomplishing the illegal and improper actions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein. Plaintiff, on behalf of Replimune, has no adequate remedy at law.

## COUNT IV

**Against the Individual Defendants for
Unjust Enrichment**

101.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

102.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Replimune.

103.    The Individual Defendants were unjustly enriched by their receipt of bonuses, stock options, or similar compensation from Replimune that was tied to their performance or to the artificially inflated valuation of Replimune.

104.    Plaintiff, as a stockholder and representative of the Company, seeks restitution from the Individual Defendants, and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants as a result of their wrongful conduct

and fiduciary breaches.

105.    As a direct and proximate result of the Individual Defendants' misconduct, the Company has suffered significant damages, as alleged herein.

106.    Plaintiff, on behalf of Replimune, has no adequate remedy at law.

## COUNT V

### Against the Individual Defendants
### for Waste of Corporate Assets

107.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

108.    The Individual Defendants breached their fiduciary duties by failing to properly supervise and monitor the adequacy of Replimune's internal controls, by issuing, causing the issuance of, and/or failing to correct the false and misleading statements identified herein, and by allowing the Company to engage in an illegal, unethical, and improper course of conduct, which was continuous, connected, and ongoing at all relevant times.

109.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, among other things, incurring and paying defense costs in connection with the Securities Class Action, and approving performance-based compensation linked to the Company's perceived successes.

110.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

111.    Plaintiff on behalf Replimune has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally,

for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.      Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.      Directing Replimune to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Replimune and its stockholders from a repeat of the damaging events described herein, including, but not limited to:

- strengthening the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

- strengthening the Company's internal reporting and financial disclosure controls;

- developing and implementing procedures for greater stockholder input into the policies and guidelines of the Board; and

- strengthening the Company's internal operational control functions.

D.      Awarding punitive damages;

E.      Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

35

Dated: August 19, 2025

**OF COUNSEL:**

**RIGRODSKY LAW, P.A.**
Timothy J. MacFall
Samir Aougab
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
Telephone: (516) 683.3516
Facsimile: (302) 654-7530
Email: tjm@rl-legal.com
Email: sa@rl-legal.com

**GRABAR LAW OFFICES**
Joshua H. Grabar
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Tel:  267-507-6085
Email: jgrabar@grabarlaw.com

**MATORIN LAW OFFICE, LLC**

By: */s/ Mitchell J. Matorin*
Mitchell J. Matorin (BBO# 649304)
18 Grove Street, Suite 5
Wellesley, MA 02482
Tel.: (781) 453-0100
mmatorin@matorinlawoffice.com
*Attorneys for Plaintiff*